UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

LIBBY LANE LEMAIRE                     CIVIL ACTION NO. 6:15-cv-02729

VERSUS                                 MAGISTRATE JUDGE HANNA

U.S. COMMISSIONER,                     BY CONSENT OF THE PARTIES
SOCIAL SECURITY
ADMINISTRATION

## MEMORANDUM  RULING

Before the Court is an appeal of the Commissioner's finding of non-disability.

In accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the

parties consented to have this matter resolved by the undersigned Magistrate Judge

(Rec. Doc. 7-1), and this matter was referred to the undersigned Magistrate Judge for

all proceedings, including the entry of judgment (Rec. Doc. 8).   Considering the

administrative record, the parties' briefs, and the applicable law, the Commissioner's

decision is AFFIRMED.

## ADMINISTRATIVE  PROCEEDINGS

The claimant, Libby Lane Lemaire, fully exhausted her administrative remedies

before filing this action.  She filed an application for disability insurance benefits,

alleging disability beginning on November 27, 2012.[1]  Her application was denied.[2]

---

[1]        Rec. Doc. 9-1 at 117, 132.

[2]        Rec. Doc. 9-1 at 64.

She requested a hearing, which was held on May 20, 2014 before Administrative Law Judge Lawrence T. Ragona.[3]   The ALJ issued a decision on August 4, 2014,[4] concluding that the claimant was not disabled between the alleged onset date and the date of the decision, within the meaning of the Social Security Act.  The claimant sought review of that decision, but the Appeals Council denied her request.[5]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the court's review pursuant to 42 U.S.C. § 405(g).  The claimant then filed this action seeking judicial review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on February 24, 1975.[6]  At the time of the ALJ's decision, she was thirty-eight years old.  She has an eleventh grade education and no subsequent vocational training.[7]  She has past relevant work experience doing fire watch for a construction company, and as a cook and food service worker in a hospital and in a nursing home.[8]  Mrs. Lemaire alleges that she has been disabled

---

[3]     The hearing transcript is found at Rec. Doc. 9-1 at 31-54.

[4]     Rec. Doc. 9-1 at 16-24.

[5]     Rec. Doc. 9-1 at 5.

[6]     Rec. Doc. 9-1 at 33, 117, 132.

[7]     Rec. Doc. 9-1 at 35, 137.

[8]     Rec. Doc. 9-1 at 137, 155.

since November 27, 2012 due to neck and shoulder conditions, carpal tunnel syndrome, diabetes, hypertension, and high cholesterol.[9]  Her alleged disability onset date coincides with the date she last worked.[10]

Mrs. Lemaire underwent a surgical procedure for ulnar transposition and carpal tunnel release on her right wrist in 2010.[11]  Pain recurred in her right hand, and she sought treatment with Dr. Gabriel Tender, a neurosurgeon at the LSU Health Sciences Center in New Orleans on February 22, 2012.[12]  Dr. Tender found that Tinel's sign was present on the right, and he recommended EMG testing.  According to Dr. Tender, the EMG study showed muscular problems at the right wrist; therefore, he ordered an MRI of her wrist and noted that revision of the carpal tunnel release was likely necessary.[13]  Although the MRI did not show any type of compression at the wrist, Dr. Tender advised moving forward with the surgery.[14]  No report on the surgery itself is contained in the record.  However, Mrs. Lemaire returned to see Dr.

---

[9]     Rec. Doc. 9-1 at 136.

[10]    Rec. Doc. 131, 132, 136.

[11]    According to the history she gave Dr. Robert L. Morrow, Jr. on September 17, 2013, that surgery was performed in November 2010.  Rec. Doc. 9-1 at 466.

[12]    Rec. Doc. 9-1 at 199-201.

[13]    Rec. Doc. 9-1 at 198.

[14]    Rec. Doc. 9-1 at 197.

Tender on July 18, 2012, which was after the surgery, and she reported that she was pain free despite a surgical complication that resulted in a portion of the surgical incision rupturing.[15]  When Mrs. Lemaire returned to see Dr. Tender on August 15, 2012, he noted that she was "doing great" with no residual pain and a well-healed wound, and he released her to light duty work.[16]  The record contains no limitations or restrictions placed on Mrs. Lemaire's activities by Dr. Tender.

On September 5, 2012, Mrs. Lemaire visited the family medicine clinic at University Medical Center ("UMC") in Lafayette, Louisiana, complaining of left upper arm pain that had lasted for three weeks and was unrelated to any particular event.  She was diagnosed with left shoulder strain and given a Kenalog injection in the shoulder.  She was also diagnosed with hypertension (for which Lisinopril was prescribed) and uncontrolled diabetes (for which Novolog was prescribed).  X-rays of her left shoulder, taken two days later, were negative.[17]

Mrs. Lemaire returned to UMC's family medicine center on October 2, 2012.[18] She reported that she was still having pain in her upper left arm but getting some

---

[15]     Rec. Doc. 9-1 at 194.

[16]     Rec. Doc. 9-1 at 193.

[17]     Rec. Doc. 9-1 at 212.

[18]     Rec. Doc. 9-1 at 213-215.

relief with chiropractic treatments.  Her diabetes was described as uncontrolled, her hypertension was described as not at goal, her Linisopril dosage was increased, and she was diagnosed with tendinitis in her left shoulder.  She was referred to physical therapy and advised to avoid chiropractic treatments.

On October 30, 2012,[19] an MRI of the claimant's left shoulder showed mild degenerative arthritis at the left glenohumeral joint and mild tendinosis involving the infraspinatus tendon.  A cervical MRI taken the same day[20] showed significant central canal stenosis at C4-5 through C6-7, moderate right neural foraminal stenosis at C5-6, and more severe left neural foraminal stenosis at C6-7.

In December 2012, Mrs. Lemaire began treating with Dr. Thomas J. Montgomery.[21]  On December 18, 2012, he performed a left shoulder manipulation under general anesthesia due to adhesive capsulitis.

The next day,[22] the claimant saw neurosurgeon Dr. Luiz DeAraujo.  Dr. DeAraujo reported to Dr. Montgomery that Ms. Lemaire had previously undergone

---

[19]     Rec. Doc. 9-1 at 238.

[20]     Rec. Doc. 9-1 at 237.

[21]     Rec. Doc. 9-1 at 253, 256-260, 289-293.

[22]     Rec. Doc. 9-1 at 227-228.

two carpal tunnel releases on the right side and one on the left side[23] as well as a right ulnar nerve decompression, that recent studies showed persistent impairment of the median nerve bilaterally, and that a recent MRI showed a cervical disc protrusion at C6-7 with impingement to the neuroforamen at that level as well as impingement of the nerve root at C5-6 on the right side secondary to spondylitic changes with decreased diameter of the spinal canal.  His examination of the claimant showed muscle spasms, a decreased range of motion in the neck, and a positive Spurling maneuver on the left side.  In Dr. DeAraujo's opinion, Mrs. Lemaire's symptoms were secondary to the lesion at C6-7, and he recommended a cervical epidural steroid injection to be followed by physical therapy, along with anti-inflammatory medication and muscle relaxants.

The claimant returned to Dr. Montgomery on December 26, 2012,[24] and reported that she was doing well following the left shoulder manipulation.  Dr. Montgomery released her to regular duty work.  The record contains no limitations or restrictions placed on Mrs. Lemaire's activities by Dr. Montgomery following the shoulder surgery.

---

[23]    There is no evidence in the record corroborating a carpal tunnel release on the left before this date.

[24]    Rec. Doc. 9-1 at 261-262.

Mrs. Lemaire underwent the epidural steroid injection recommended by Dr. DeAraujo, but she did not have significant improvement; therefore, Dr. DeAraujo recommended surgery.[25]

Because of an abnormal EKG, Mrs. Lemaire saw a cardiologist, Dr. Raghotham Patlola, on January 16, 2013, to obtain clearance before her neck surgery.[26]  She also followed up with Dr. Patlola on February 28, 2013,[27] and March 5, 2013.[28]

Dr. DeAraujo performed an anterior cervical microdiscectomy and fusion with instrumentation at C6-7 on January 22, 2013.[29]

On January 30, 2013, Mrs. Lemaire returned to see Dr. Montgomery.[30]  She was six weeks post-op on the left shoulder manipulation.  Dr. Montgomery noted that her range of motion was improving, she was doing well, and she had almost a full range of motion in her shoulder.  Due to the recent neck surgery, however, Dr. DeAraujo had her on no work status for the next three months.

---

[25]     Rec. Doc. 9-1 at 226.

[26]     Rec. Doc. 9-1 at 428-442.

[27]     Rec. Doc. 9-1 at 424-427.

[28]     Rec. Doc. 9-1 at 405-407.

[29]     Rec. Doc. 9-1 at 229-230.

[30]     Rec. Doc. 9-1 at 264-265.

On February 14, 2013, the claimant had a new-patient visit with Dr. Kerry Schexnaider, an internist.[31]  His diagnoses were diabetes and hypertension.  When Mrs. Lemaire returned to Dr. Schexnaider on March 1, 2013,[32] he added proteinuria and pure hypercholesterolemia to her diagnoses, noting that her diabetes, hypercholesterolemia, and hypertension were not at goal.

At Dr. DeAraujo's request, cervical spine x-rays were taken on March 13, 2013.[33]  These showed satisfactory alignment of the plate and screws placed during surgery, no evidence of prevertebral soft tissue swelling, fracture, or subluxation, and no instability with flexion and extension positioning.  A CT scan of Mrs. Lemaire's cervical spine, obtained on April 4, 2013, showed a stable lower cervical fusion with spondylosis but no evidence of acute fracture or dislocation.[34]

On April 15, 2013, Mrs. Lemaire telephoned Dr. Montgomery's office asking for more pain medication for her shoulder, and a prescription was called in to the pharmacy.[35]  On April 22, 2013,[36] she visited Dr. Montgomery's office, complaining

---

[31]    Rec. Doc. 9-1 at 297-300.

[32]    Rec. Doc. 9-1 at 301-304.

[33]    Rec. Doc. 9-1 at 234.

[34]    Rec. Doc. 9-1 at 233.

[35]    Rec. Doc. 9-1 at 267.

[36]    Rec. Doc. 9-1 at 268-270.

that she had recently fallen while holding a door open with her right hand, injuring her right shoulder.  She reported popping in the shoulder, pain in both upper extremities, an inability to move her arms back, and an inability to lift her arms above her head.  She also complained of bilateral numbness to the tips of her fingers and decreased strength due to pain.  She told Dr. Montgomery that she had never gotten back to 100% following the left shoulder manipulation and had not yet returned to work following neck surgery.  Dr. Montgomery's examination showed no swelling, no spasm, no atrophy, full forward flexion, and no objective signs of injury to either shoulder but he detected mild impingement of the right shoulder.  He found that both shoulders were neurovascularly intact.  Clavicle x-rays showed mild AC joint arthritis.  Dr. Montgomery's impressions were residual arthrofibrosis and right shoulder bursitis.  Dr. Montgomery injected both shoulders with lidocaine, and he prescribed Norco for pain.  The claimant called Dr. Montgomery's office on May 2, 2013, complaining that the injections did not work and she was in a lot of pain.[37]  Her pain medication was refilled.[38]  When the claimant called five days later, seeking

---

[37]     Rec. Doc. 9-1 at 271.

[38]     Rec. Doc. 9-1 at 272.

more pain medication, Dr. Montgomery advised that no refills would be given and repeat MRIs would be necessary if she was still having problems.[39]

MRIs of the right and left shoulder were performed on May 13, 2013.[40]  A ganglion cyst within the subscapularis recess was detected.  There was no evidence of a rotator cuff tear on the right shoulder, but there was mild supraspinatus and infraspinatus tendinosis.  The MRI detected a small undersurface tear involving the distal supraspinatus of the left shoulder as well as fluid within the subacromial and subdeltoid bursa relating to mild bursitis.

Mrs. Lemaire saw Dr. Montgomery again on May 15, 2013.[41]  His impression was rotator cuff tendinitis.  He stated that "I really do not have anything to offer her. I would not recommend any surgical treatment.  I think her problems are more of a chronic nature."  He recommended that she see a pain management specialist.

On May 30, 2013, Mrs. Lemaire saw Dr. Malcolm J. Stubbs, an orthopedic surgeon,[42] complaining of bilateral shoulder pain, left greater than right.  She rated her pain as eight on a scale of one to ten.  On examination, Dr. Stubbs found positive

---

[39]     Rec. Doc. 9-1 at 273.

[40]     Rec. Doc. 9-1 at 231-232.

[41]     Rec. Doc. 9-1 at 386.

[42]     Rec. Doc. 9-1 at 364-366.

-10-

signs of impingement in both shoulders.  His impressions were left shoulder partial rotator cuff tear with impingement and acromioclavicular arthritis and adhesive capsulitis, and right shoulder adhesive capsulitis.  He injected her right shoulder with a lidocaine and Solu-Medrol.  For the left shoulder, he recommended arthroscopy with rotator cuff repair, decompression, distal clavicle excision, and possible capsule release.  The left shoulder surgery was performed on June 18, 2013.[43]

Mrs. Lemaire saw Dr. Stubbs again on June 24, 2013.[44]  He noted that she was "doing fairly well" and that "her pain is under control."  When she saw Dr. Stubbs on July 8, 2013,[45] she was still having some discomfort.  On August 5, 2013,[46] Dr. Stubbs noted that she was "making improvement" and that her "pain has decreased."

On July 1, 2013, the claimant again saw Dr. DeAraujo.[47]  He noted that she was doing well, that she had undergone left shoulder surgery by Dr. Stubbs, and that her cervical spine was asymptomatic.  She had a full range of motion in her neck and no muscle spasms.  He anticipated just one more follow-up visit.

---

[43]     Rec. Doc. 9-1 at 370-373.

[44]     Rec. Doc. 9-1 at 374.

[45]     Rec. Doc. 9-1 at 392.

[46]     Rec. Doc. 9-1 at 391.

[47]     Rec. Doc. 9-1 at 505.

On September 4, 2013, Mrs. Lemaire visited Dr. DeAraujo.[48]  He noted that she was doing very well, was free of radicular pain, and was recovering well from the surgery on her left shoulder.  He found that she had a full range of motion in her neck and normal tendon reflexes in both arms with no significant muscle spasm.  He released her from his care.  The record contains no limitations or restrictions placed on Mrs. Lemaire's activities by Dr. DeAraujo in connection with her neck surgery.

Mrs. Lemaire returned to see Dr. Stubbs on September 5, 2013.[49]  Dr. Stubbs noted that she was no longer taking pain medication and her activity level had increased.  However, she complained of right hand numbness and tingling on both the left and right.  Dr. Stubbs stated that "[i]t sounds as though she has recurrent carpal tunnel syndrome on the right. . . [and] similar symptoms on the left."  He ordered a nerve conduction study.

The next day, on September 6, 2013, Mrs. Lemaire was examined by Dr. Julana Monti at the request of Disability Determination Services.[50]  Mrs. Lemaire reported that she had worked until November 2012 as a dietary aide and cook but was having trouble doing the work due to her neck, left shoulder, and hands.  She reported the

---

[48]     Rec. Doc. 9-1 at 504.

[49]     Rec. Doc. 9-1 at 389-390.

[50]     Rec. Doc. 9-1 at 377-381.

cervical surgery of January 2013, and stated that if she sits in one place too long, her neck and legs begin to hurt.  She also stated that she cannot lift things due to neck pain.  Mrs. Lemaire also told Dr. Monti that she had undergone two carpal tunnel surgeries on her right hand but was continuing to have weakness, pain, and numbness in her hands.  She reported that her doctor told her that she needs to have surgery on both hands.  Mrs. Lemaire also reported arthritis in her shoulders.  She told Dr. Monti about her shoulder surgery, and stated that she experienced a rotator cuff tear in the left shoulder during therapy following surgery, which was also surgically repaired. She also reported that she has insulin-dependent diabetes mellitus.

Upon examination, Dr. Monti found positive Tinel's sign bilaterally, a decreased range of motion in the left shoulder, and painful strength testing around the left shoulder.  Grip strength in both hands was 4/5, and her dexterity was intact.

Dr. Monti stated that "[b]ased on the claimant given history, available medical records, and physical exam, I believe the claimant should be able to sit, stand and walk for 8 hours per workday without an assistive device, and lift or carry objects weighing up to 5 pounds.  There are no restrictions on the claimant's ability to read, but would be able to drive in 2 hour increments due to shoulder pain and carpal tunnel syndrome, and would have difficulty to perform fine motor tasks for longer than 2 hour increments due to carpal tunnel syndrome."

On September 17, 2013, Mrs. Lemaire had an initial visit with Dr. Robert L. Morrow.  Dr. Morrow noted that she had been referred to him by Dr. DeAraujo because of ongoing numbness and tingling in both hands.  Upon examination, Dr. Morrow found that she had a full range of motion in both wrists and could form fists with both hands.  The temperature of both hands was the same.  There was no substantial atrophy of the muscles of either hand.  Strength in both hands was 5/5. She had a positive Tinel's sign of the right median nerve and was tender to palpation over the prior surgical incision.  She had some irritation of the ulnar nerve at the right wrist but no referral to the ring or small fingers.  She also had decreased light touch sensory perception in the right median nerve distribution.  The left median nerve Tinel's test was slightly positive but left ulnar nerve Tinel's test was negative.  Dr. Morrow's impression was ongoing right carpal tunnel symptomatology and left carpal tunnel syndrome.  He found the claimant to be a candidate for further decompression of her right median nerve.  He recommended nerve conduction studies and an ultrasound of the nerves.

On October 4, 2013,[51] Mrs. Lemaire was seen by ophthalmologist Dr. Kerry N. Brown on referral from Dr. Schexnaider.  He found an acute hordeolum (stye) on the left lower eyelid, proliferative diabetic retinopathy in both eyes, no macular edema

---

[51]     Rec. Doc. 9-1 at 492-497.

in both eyes, and cataracts in both eyes that he described as "not significant."  The

claimant followed up with Dr. Brown on December 18, 2013.[52]

On October 8, 2013, Dr. James N. Domingue, a neurologist, conducted EMG

and ultrasound testing on the claimant.[53]  That same day, the claimant returned to Dr.

Morrow,[54] who reported that Dr. Domingue's testing showed abnormalities in the

nerve conduction study indicative of bilateral lesions of the median nerves at the

wrists as well as of the ulnar nerves at the elbows.  Dr. Domingue suspected that the

EMG abnormalities were residue of the C6 or C7 radiculopathy that was treated

surgically in January 2013.  The ultrasound of the right median nerve showed slight

enlargement of the median nerve at the wrist and appeared edematous.  Dr. Morrow

again recommended surgery.  Mrs. Lemaire visited Dr. Morrow again on October 15,

2013,[55] and the surgical recommendation was discussed.

On October 16, 2013,[56] Dr. Morrow performed decompression and external

neurolysis of the right medial nerve and distal forearm, wrist, and hand with wrapping

of the nerve.  The operative report indicates that there was extensive 5.5 cm long

---

[52]     Rec. Doc. 9-1 at 488-491.

[53]     Rec. Doc. 9-1 at 444-450.

[54]     Rec. Doc. 9-1 at 462-464.

[55]     Rec. Doc. 9-1 at 458-460.

[56]     Rec. Doc. 9-1 at 482-483.

scarring of the median nerve, which was removed.  Dr. Morrow's post-surgical diagnoses were recurrent right carpal tunnel syndrome, secondary to extensive scarring of the median nerve in the distal forearm, wrist, and hand, and left carpal tunnel syndrome.

The claimant followed up with Dr. Morrow on October 29, 2013.[57]  She was having some tingling sensations, which were improving, and she was able to flex and extend her fingers.  Dr. Morrow advised her to perform therapeutic movements of the wrist, and he refilled her pain medication.  The record contains no limitations or restrictions placed on Mrs. Lemaire's activities by Dr. Morrow in connection with the carpal tunnel release surgery that he performed.

On November 27, 2013,[58] the claimant underwent testing at Our Lady of Lourdes Regional Medical Center ordered by Dr. DeAraujo.

On December 5, 2013, Dr. DeAraujo performed a left carpal tunnel release.[59] Mrs. Lemaire followed up with Dr. DeAraujo on December 16 and December 23, 2016.  At both visits, he noted that she was progressing well despite a small area of

---

[57]     Rec. Doc. 9-1 at 455-457.

[58]     Rec. Doc. 9-1 at 471-479.

[59]     Rec. Doc. 9-1 at 469-470.

dehiscence of the incision.[60]  On December 30, 2013 and again on January 6, 2013, Dr. DeAraujo noted that the wound was healing well, and he advised the claimant to do range of motion exercises.[61]  The record contains no limitations or restrictions placed on Mrs. Lemaire's activities by Dr. DeAraujo in connection with the left carpal tunnel release surgery.

On March 17, 2014,[62] Mrs. Lemaire had a CT of the cervical spine, which showed a prior anterior fusion at C6-7, with central canal stenosis and mild bilateral neural foraminal stenosis noted at that level but no acute fracture or subluxation.

On May 2, 2014,[63] Mrs. Lemaire visited the internal medicine clinic at UMC, complaining of neck pain and requesting refills of her medication.  At that time, she was prescribed Coreg, Hydrochlorothiazide, Insulin, Lantus, Lisinopril, Norco, Soma, Tramadol, and Xanax.

At the hearing, on May 20, 2014, Mrs. Lemaire testified that she has not regained full strength in her arms, that her hands sometimes get numb and burn, and that she gets dizzy when she bends over.  She claimed to have fallen down three times

---

[60]      Rec. Doc. 9-1 a 502.

[61]      Rec. Doc. 9-1 at 501.

[62]      Rec. Doc. 9-1 at 520.

[63]      Rec. Doc. 9-1 at 511-513.

in the previous year because of dizziness. She also stated that she cannot lift her arms up and cannot hold things in her hands without dropping them. Mrs. Lemaire stated that she had surgery in both eyes in November 2013 due to diabetic retinopathy, but there is no evidence in the record corroborating that contention. She testified that she can only walk about half a block before her legs start hurting and go numb. She claims that she does no housework and no gardening and shops for groceries about once a month. When she goes to the grocery store, she is pushed in a wheelchair. She occasionally uses the computer. Mrs. Lemaire stated that her medications make her sleepy, dizzy, and nauseated. She said she takes about three naps per day, for thirty minutes to an hour each. She stated that she does not sleep well at night because her neck and arms hurt. She stated that when she drives, she only goes about four blocks and does not drive alone because her hands go numb. She said that she sometimes reads but cannot hold a book up. She testified that she can lift only about five pounds, cannot dress and bathe herself because she cannot lift up her arms long enough, and wears a wig because she cannot brush her hair. She does not cook. She said, "I can't even stir eggs with a spoon without my arms hurting me." She testified that she has not sought pain management because she has no insurance and cannot afford it.

At the time of the hearing, Ms. Lemaire was taking Soma (a muscle relaxer),

Xanax (to help her sleep), HLTZ and Coreg (for high blood pressure), Metformin,

Humulin, and Lantus (for diabetes), and Provastatin (for high cholesterol).

## ANALYSIS

### A.    THE STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited

to determining whether substantial evidence supports the decision and whether the

proper legal standards were used in evaluating the evidence.[64]  "Substantial evidence

is more than a scintilla, less than a preponderance, and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion."[65]  Substantial

evidence "must do more than create a suspicion of the existence of the fact to be

established, but 'no substantial evidence' will only be found when there is a

'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[66]

---

[64]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[65]     *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[66]     *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[67]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[68]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[69]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[70]

## B.   ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[71]

---

[67]      42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[68]      *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).

[69]      *Martinez v. Chater*, 64 F.3d at 174.

[70]      *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

[71]      See 42 U.S.C. § 423(a).

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[72]   A claimant is determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[73]

## C.   THE EVALUATION PROCESS AND THE BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether a claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is

---

[72]      42 U.S.C. § 1382c(a)(3)(A).

[73]      42 U.S.C. § 1382c(a)(3)(B).

able to do the kind of work he did in the past; and (5) can perform any other work.[74]

"A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[75]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[76] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[77]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[78]

The claimant bears the burden of proof on the first four steps.[79]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can

---

[74]    20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[75]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).  See, also, 20 C.F.R. § 404.1520(a)(4).

[76]    20 C.F.R. § 404.1520(a)(4).

[77]    20 C.F.R. § 404.1545(a)(1).

[78]    20 C.F.R. § 404.1520(e).

[79]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

-22-

perform other substantial work in the national economy.[80]   This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[81]   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[82]

D.   **THE ALJ'S FINDINGS AND CONCLUSIONS**

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since November 27, 2012.[83]   This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  a cervical spine disorder (history of cervical spine fusion surgery); bilateral carpal tunnel syndrome; left shoulder partial rotator cuff tear with impingement, arthritis, and adhesive capsulitis (status post rotator cuff repair); diabetes; and hypertension.[84]   This finding is supported by evidence in the record.

---

[80]   *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[81]   *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[82]   *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[83]   Rec. Doc. 9-1 at 18.

[84]   Rec. Doc. 9-1 at 18.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[85]  The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform light work, except that she can do no overhead work and she can do frequent but not constant handling and fingering.[86]  The claimant challenges this finding.

At step four, the ALJ found that the claimant is capable of performing her past relevant work as a firewatcher and as a fast food worker.[87]  The claimant challenges this finding.

Having found that the claimant can perform her past relevant work, the ALJ did not proceed to step five of the sequential analysis.[88]  The ALJ found that the claimant was not disabled from November 27, 2012 (the alleged disability onset date) through August 4, 2014 (the date of the decision) because she can perform her past relevant work.[89]  The claimant challenges this finding.

---

[85]      Rec. Doc. 9-1 at 18.

[86]      Rec. Doc. 9-1 at 19.

[87]      Rec. Doc. 9-1 at 25.

[88]      Rec. Doc. 9-1 at 24.

[89]      Rec. Doc. 9-1 at 24.

-24-

### E.   THE CLAIMANT'S ALLEGATIONS OF ERROR

The claimant argues that the ALJ erred (1) because he improperly evaluated the medical evidence; and (2) because he improperly evaluated the claimant's residual functional capacity.

### F.   THE ALJ'S EVALUATION OF THE MEDICAL EVIDENCE AND EVALUATION OF THE CLAIMANT'S RESIDUAL FUNCTIONAL CAPACITY

The claimant argues that the ALJ erred in failing to properly evaluate the medical evidence in the record and erred in evaluating the claimant's residual functional capacity.  These arguments are so closely related that the claimant did not brief them separately.  Accordingly, this Court will analyze the two issues together.

The claimant argues that the ALJ failed to properly weigh the medical opinions, resulting in a residual functional capacity evaluation that is not supported by substantial evidence in the record.  More particularly, the claimant argues that the ALJ erred in rejecting Dr. Monti's opinion regarding the claimant's ability to engage in fine manipulation or fingering.  Dr. Monti stated, in her report, that the claimant is capable of sitting, standing, and walking for eight hours per work day without an assistive device, that she can lift or carry objects weighing up to five pounds, that there are no restrictions on her ability to read, that she would be able to drive for two-hour increments due to her shoulder pain and carpal tunnel syndrome, and that she

would have difficulty in performing fine motor tasks for longer than two-hour increments due to carpal tunnel syndrome.

The Social Security regulations and rulings explain how medical opinions are to be weighed.[90]  Generally, the ALJ must evaluate all of the evidence in the case and determine the extent to which medical source opinions are supported by the record. Furthermore, more weight will usually be given to the opinion of a source who examined the claimant than to the opinions of a source who did not examine the claimant.[91]  In this case, however, the ALJ gave "great weight" to the opinions of treating physician Dr. Stubbs (who performed left shoulder surgery on June 18, 2013), gave "great weight" to the opinions of the agency medical consultant Dr. Timothy Honigman (who did not examine the claimant), and gave only "some weight" to the opinions of Dr. Monti (the consultative physician who examined the claimant).  The claimant argues that Dr. Monti's opinions should have been given more weight than those of Dr. Honigman, especially with regard to the claimant's ability to use her hands in fine manipulation or fingering.

None of the claimant's treating physicians opined as to the frequency with which Mrs. Lemaire could perform gross or fine manipulation of her hands and

---

[90]        20 C.F.R. § 404.1527(c), § 416.927(c), SSR 96-2p, SSR 96-5p.

[91]        20 C.F.R. § 404.1527(c)(1).

fingers.  However, Dr. Honigman's opinions are based solely on other doctors' medical records, while Dr. Monti's opinion are based, at least in part, on her own examination of the claimant.

The ALJ expressly found that there was "no objective evidence to support the lifting and driving restrictions" imposed by Dr. Monti.  Dr. Monti stated that her driving and lifting restrictions were based on the history given by the claimant, the available medical records, and her physical examination of the claimant.  But she did not state an objective basis for finding that the claimant should be limited to lifting no more than five pounds, and no such restrictions were imposed by any of the claimant's treating physicians at any time.  Dr. Monti explained that her restriction on driving for more than two hours at a time was based on the claimant's complaints of shoulder pain and on her carpal tunnel syndrome, but Dr. Monti did not explain the basis for the five-pound lifting restriction.

The claimant suggests that she continued to have central canal and bilateral foraminal stenosis at C6-7 following surgery as well as central canal stenosis at C4-5 and C5-6, and she attempts to link this to Dr. Monti's lifting restriction.  But the surgeon who treated her cervical spine did not impose a lifting restriction and Dr. Monti did not address these conditions in analyzing the claimant's lifting ability.

Therefore, this Court finds that the ALJ erred in rejecting the driving restriction but did not err in rejecting the lifting restriction imposed by Dr. Monti.

Although Dr. Monti opined that the claimant's fine manipulation ability was limited to two-hour increments, the ALJ found that the claimant was capable of frequent handling or fingering. In reaching that conclusion, the ALJ relied upon Dr. Honigman's opinion that the claimant was capable of unlimited gross and fine manipulation combined with then-existing diagnoses of carpal tunnel syndrome in both hands. The claimant argues that this was error because Dr. Monti had an objective basis for her opinion, including a finding of decreased grip strength and a positive Tinel's sign. The claimant is correct that there were objective bases for Dr. Monti's opinion. But the claimant is incorrect in concluding that the ALJ's error in failing to give great weight to Dr. Monti's opinion requires reversal of the ALJ's finding that the claimant is not disabled.

Dr. Monti did not, as the claimant suggests, find that the claimant is limited to fine manipulation or fingering for only two hours per day. Her finding was that Mrs. Lemaire should limit fingering to two hours at a time; however, Dr. Monti did not explain how much time should elapse between the two hour periods. The ALJ found that the claimant could perform fine manipulation frequently. Since the word "frequent" is defined in the Social Security regulations to mean one-third to two-

thirds of the time, the ALJ's finding was that the claimant can perform fine manipulation for 2.6 to 5.33 hours out of the work day.  That finding is not wholly inconsistent with Dr. Monti's opinion that the claimant's fine manipulation should be limited to two-hour increments.  Furthermore, even if Dr. Monti's opinion was interpreted to mean that the claimant was limited to fine manipulation during no more than two hours out of an eight-hour work day, the claimant would not be disqualified from performing any and all work.

"Although the ALJ may weigh competing medical opinions about. . . limitations and use objective medical evidence to support its determination that one opinion is better founded than another, neither the ALJ nor the court is free to substitute its own opinion."[92]  The claimant argues that the ALJ characterized the medical evidence to suit his residual functional assessment, pointing out the ALJ's alleged use of the word "minor" to describe the stenosis identified in the March 17, 2014 CT scan and the ALJ's omission of any reference to alleged nerve damage in the claimant's right hand.  This Court finds, however, that the ALJ did not substitute his own opinion for that of the medical experts.  This Court was unable to locate the ALJ's description of the stenosis as minor, and there is no indication in the record of

---

[92]     *Fabre v. Astrue*, No. 13-00076-BAJ-RLB, 2014 WL 4386424, at *6 n. 6 (M.D. La. Sept. 4, 2014).

continued nerve damage following the two most recent carpal tunnel release surgeries.   Neither Dr. DeAraujo nor Dr. Morrow placed any restrictions or limitations on the claimant's use of her hands or arms following those operations. The ALJ's finding with regard to the restrictions on the claimant's ability to drive, lift, and perform fine manipulation was a reasonable finding that is supported by substantial evidence in the record.  In particular, the record indicates that, after Dr. Monti and Dr. Honigman rendered their opinions, the claimant underwent two successful carpal tunnel surgeries, one on each hand, and her treating physicians did not place any restrictions on her – with regard to driving, lifting, gross manipulation, or fine manipulation.  The ALJ acknowledged the claimant's continued complaints of numbness and tingling that she reported to Dr. Morrow in October 2013 but also noted that, after the surgery, these symptoms were improving and she was able to extend and flex her fingers.  There is nothing in the records from Dr. Morrow and Dr. DeAraujo indicating any limitation or restriction on the use of her hands following the two most recent carpal tunnel release surgeries.

Although the ALJ should have given great weight to Dr. Monti's opinions, "[p]rocedural perfection in administrative proceedings is not required."[93]  In this case,

---

[93]     *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

the ALJ's error in weighing the medical opinions did not affect the claimant's substantive rights.

The responsibility for determining a claimant's residual functional capacity belongs to the ALJ.[94]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[95]  This Court finds that the ALJ applied the proper legal principles in evaluating the claimant's residual functional capacity and reached a conclusion that is supported by substantial evidence in the record.  Accordingly, this Court finds that the ALJ's ruling should be affirmed.

## CONCLUSION

This Court finds that, although the ALJ erred in failing to give great weight to Dr. Monti's opinions, the conclusions reached by the ALJ – particularly with regard to the claimant's residual functional capacity – are supported by substantial evidence in the record, and the claimant's substantive rights were not affected.  Accordingly,

IT IS ORDERED that the Commissioner's decision is AFFIRMED, and this action is dismissed with prejudice.

---

[94]     *Ripley v. Chater*, 67 F.3d at 557.

[95]     *Martinez v. Chater*, 64 F.3d at 176.

-31-

Signed at Lafayette, Louisiana, on this 5th day of October 2016.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE